108 T.C. No. 26


UNITED STATES TAX COURT



INTERNATIONAL MULTIFOODS CORPORATION AND AFFILIATED COMPANIES,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 11643-92.                    Filed June 18, 1997.


     On Mar. 30, 1987, P, a domestic corporation,
entered into an agreement with Borden to sell P's stock
in Paty, a limitada organized under the laws of the
Federal Republic of Brazil.  P realized a loss upon the
sale of the Paty stock, which P reported as a U.S.
source loss for purposes of its foreign tax credit
computation under sec. 904(a), I.R.C.  R determined
that the loss was foreign source.

     Held:  P's loss is sourced in the United States.
Sec. 865, I.R.C., which provides that income from the
sale of noninventory personal property is generally
sourced at the residence of the seller, is also
generally applicable in sourcing losses realized on the
sale of such property.

David R. Brennan, John K. Steffen, Susan B. Grupe, and Nathan P. Zietlow, for petitioner.

Jack Forsberg, for respondent.

RUWE, Judge:  On March 26, 1992, respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Taxable Year Ended | Deficiency |
| --- | --- |
| Feb. 28, 1987 | $2,962,380 |
| Feb. 29, 1988 | 3,592,402 |

Petitioner paid these deficiencies following receipt of its notice of deficiency and on June 1, 1992, filed a petition with this Court claiming an overpayment of income tax for each year.

In International Multifoods Corp. v. Commissioner, 108 T.C. 25 (1997), we disposed of several issues in this case.  In an order accompanying the release of our opinion, we granted respondent's motion to sever and hold the sole remaining issue in abeyance.  This remaining issue requires us to decide whether the loss realized by petitioner on its sale of the stock of Paty S.A.-Produtos Alimenticios, Ltda.,[1] on March 31, 1987, is to be sourced in the United States for purposes of computing

---

[1]Hereinafter, we shall refer to Paty S.A.-Produtos Alimenticios, Ltda., as Paty and to the issue in question as the Paty stock loss issue.

petitioner's foreign tax credit limitation under section 904(a).[2]

We severed this issue because the Department of the Treasury (Treasury) issued proposed regulations on July 8, 1996, involving the allocation of losses realized on the disposition of stock (the stock loss regulations).  The summary to the proposed regulations stated that "The regulations are necessary to modify existing guidance with respect to stock losses."  61 Fed. Reg. 35696 (July 8, 1996).  Pursuant to the proposed regulations, losses realized on the disposition of stock of a corporation in which the taxpayer owns a 10-percent or greater interest generally would be sourced in the residence of the seller.  Sec. 1.865-2(a)(1), Proposed Income Tax Regs., 61 Fed. Reg. 35698 (July 8, 1996).  With respect to losses realized on the disposition of all other personal property, the proposed regulations provide that section 1.861-8, Income Tax Regs., or other administrative pronouncements will continue to apply.  Sec. 1.865-1, Proposed Income Tax Regs., 61 Fed. Reg. 35698 (July 8, 1996).  If the proposed regulations are finalized in their current form, petitioner would be permitted to elect retroactively to source its Paty stock loss in the United States. See sec. 1.865-2(a)(1), (e)(2)(i), Proposed Income Tax Regs., 61 Fed. Reg. 35698-35700 (July 8, 1996).

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In his motion to sever issue, filed on July 19, 1996, respondent stated:  "At this time, respondent is hopeful that the proposed regulations will be finalized during the beginning of the 1997 calendar year."  On March 3, 1997, respondent filed a status report, which indicated that the stock loss regulations had not yet been finalized.  On March 5, 1997, we ordered respondent to file, on or before May 12, 1997, an additional status report with respect to the finalization of these regulations.

On March 13, 1997, petitioner filed a Motion for Court to Decide Paty Loss Issue.  In its motion, petitioner stated that on the basis of respondent's March 3, 1997, status report, "it does not appear that there is any specific date by which the proposed regulations are targeted to be issued as a Treasury Decision."  Petitioner also argued that despite respondent's acknowledgment that the adoption of the proposed regulations in their current form would decide the Paty stock loss issue in petitioner's favor, "Respondent continues to decline confessing error.  The only purpose for not doing so is to preserve the ability to contest the Petitioner's treatment of the loss."  Petitioner maintained that "The prejudice is compounded by the fact that the Petitioner has not only paid the full amount of the determined deficiencies and interest thereon in the present case, it has overpaid the deficiencies and interest based upon the settlement of other issues."  On April 29, 1997, respondent filed a Notice

of Objection to Petitioner's Motion for Court to Decide Paty Loss Issue, in which respondent contended that "It is in the interest of judicial economy for the Court to continue to hold the PATY stock loss issue in abeyance pending a further status report by the respondent regarding the finalization of the stock loss regulations."  In a status report filed May 12, 1997, respondent informed the Court that the proposed regulations were still not finalized.

We agree with petitioner that the time has come to decide this issue.  In granting respondent's motion to sever, we relied, in large part, upon respondent's statement that he was "hopeful" that the proposed regulations would be finalized by the beginning of 1997.  It is now over 10 years since the enactment of section 865(j)(1) directing the Secretary to promulgate regulations regarding this issue.  However, as of the date of issuance of this opinion, the regulations still remain in proposed form. Petitioner has already paid the deficiencies determined in the notice of deficiency and is entitled to a decision on the merits.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  At the time its petition was filed, petitioner maintained its principal place of business in Minneapolis, Minnesota.  Damca International Corp. (Damca) was a wholly owned subsidiary of petitioner and joined in the filing of petitioner's consolidated

Federal income tax return for the taxable year ended February 29, 1988.

Petitioner and Damca owned 100 percent of the outstanding stock of Multifoods Alimentos, Ltda. (MAL). On February 22, 1979, MAL acquired 85 percent of the outstanding stock of Paty. MAL and Paty were Brazilian "limitadas" organized under the laws of the Federal Republic of Brazil.

Paty was a regional pasta manufacturer, which marketed its products in the greater Rio de Janeiro area. Petitioner acquired an indirect interest in Paty, because it believed Paty would be a profitable investment. Through that investment, petitioner sought to expand its presence in Latin America and provide its stock with more appeal to the stockholding community.

By February 1982, petitioner and MAL had acquired the remaining 15 percent of the stock outstanding in Paty. On February 29, 1984, the Paty stock which MAL held was distributed to petitioner and Damca upon MAL's liquidation. During its fiscal year 1986, petitioner transferred all but one share of its Paty stock to Damca.

Pursuant to a Quota Purchase Agreement,[3] entered into on March 30, 1987, petitioner and Damca sold their stock in Paty to Borden, Inc., and its Panamanian subsidiary Borden S.A. Borden, Inc., acquired one share of Paty stock, and Borden S.A., acquired

---

[3]A share of stock in a Brazilian limitada is called a "quota".

the remaining 1,597,135,239 shares.  The closing of the transaction occurred at Borden, Inc.'s, offices in New York, New York, on March 31, 1987.

Petitioner sold Paty because it proved to be an unprofitable investment, principally due to price controls imposed by the Brazilian Government.  With the exception of the taxable year ended February 29, 1980, Paty never generated net income for any year subsequent to MAL's acquisition of an interest in Paty.  At the time of sale, Paty had a net deficit in earnings of $5,053,076.  Neither petitioner nor Damca received any dividends from Paty.

Damca realized a loss of $3,922,310 upon the sale of its Paty stock.  Of that amount, petitioner reported only $3,772,310 as a loss due to a $150,000 error in calculating losses.  On its U.S. Corporation Income Tax Return (Form 1120) for the taxable year ended February 29, 1988, petitioner reported the loss as a U.S. source loss in computing its foreign tax credit limitation. Respondent determined that the loss from the sale of the Paty stock must be sourced outside the United States.

## OPINION

The sole issue for decision is whether the loss realized by petitioner on the sale of its Paty stock is to be sourced in the United States for purposes of determining petitioner's foreign tax credit limitation under section 904(a).

Enacted as part of the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1211(a), 100 Stat. 2085, 2533, section 865 provides that income from the sale of noninventory personal property generally will be sourced at the residence of the seller.[4] In explaining the purpose behind the passage of section 865, the House report stated:

> Source rules for sales of personal property should reflect the location of the economic activity generating the income at issue or the place of utilization of the assets generating that income. In addition, source rules should operate clearly without the necessity for burdensome factual determinations, limit erosion of the U.S. tax base and, in connection with the foreign tax credit limitation, generally not treat as foreign income any income that foreign countries do not or should not tax.

> Although the title passage rule operates clearly, it is manipulable. It allows taxpayers to treat sales income as foreign source income simply by passing title to the property sold offshore even though the sales activities may have taken place in the United States. In such cases, the foreign tax credit limitation may be artificially inflated. In addition, foreign countries are unlikely to tax income on a title passage basis. Thus, the title passage rule gives U.S. persons the ability to create foreign source income that is not subject to any foreign tax, and that may ultimately be sheltered from U.S. tax with unrelated excess foreign tax credits. In addition, it gives foreign persons the ability to generate income that should be subject to U.S. tax.

---

[4]Sec. 1211(a) is generally effective for taxable years beginning after Dec. 31, 1986. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1211(c)(1), 100 Stat. 2085, 2536.

Because the residence of the seller generally is the location of much of the underlying activity that generates income derived from sales of personal property, the committee believes that sales income generally should be sourced there. * * * [H. Rept. 99-426, at 360 (1985), 1986-3 C.B. (Vol. 2) 1, 360.[5]]

Section 865(j)(1) provides that "The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purpose of this section, including regulations * * * relating to the treatment of losses from sales of personal property". There is no dispute that the Paty stock sold by petitioner constitutes personal property under section 865(a).

---

[5]Congress created several exceptions to the application of the general rule in sec. 865(a). For instance, the general rule of sec. 865(a) is inapplicable to the sourcing of gain realized on the disposition of personal property if depreciation deductions have been allowed with respect to the property for U.S. tax purposes. Pursuant to a recapture rule, any realized gain (up to the amount of depreciation taken on the property) generally receives the same source characterization as the depreciation deductions. Sec. 865(c)(1). With respect to the sale of intangible property, sec. 865(d)(1)(A) provides that the general rule of sec. 865(a) is applicable only if the gain is recognized on a payment that is not "contingent on the productivity, use, or disposition of the intangible". In addition, gain realized on a domestic corporation's sale of stock in a foreign corporation is sourced outside the United States if (1) the two corporations would be members of the same affiliated group but for the exclusion of foreign corporations from affiliated groups; (2) the foreign corporation is actively engaged in a trade or business in a particular foreign country; (3) for the 3-year period ending with the taxable year of the foreign corporation immediately preceding the year in which the stock disposition occurs, at least 50 percent of its gross income was derived from the active conduct of a trade or business in such foreign country; and (4) title to the stock passes to the purchaser within the foreign country in which the business is located. Sec. 865(f), (i)(4). Respondent does not argue that any of the exceptions to the general rule of sec. 865(a) are applicable in the instant case.

Petitioner contends that section 865 compels symmetrical treatment for gains and losses. Since it is a U.S. resident, petitioner argues that its loss from the sale of the Paty stock must be sourced in the United States. See sec. 865(a)(1), (g)(1)(A)(ii). Respondent, on the other hand, contends that section 865 applies solely to the sourcing of <u>income</u> from the sale of personal property. The rules governing the allocation of losses, respondent maintains, remain those contained in regulations promulgated under sections 861(b) and 862(b). Respondent argues that the Tax Reform Act of 1986 did not modify the preexisting regulatory rules respecting the allocation of <u>losses</u> from the sale of personal property.

Section 861(a) provides rules for sourcing gross income within the United States, and section 862(a) provides similar rules for sourcing gross income from sources without the United States. Section 863(a) authorizes the Secretary to prescribe regulations specifying the methods of allocation for expenses, losses, and deductions that are derived from domestic and foreign sources. Section 1.861-8(b), Income Tax Regs., provides that deductions are allocated to the class of gross income to which they are definitely related. Section 1.861-8(e)(7), Income Tax Regs., provides rules for the allocation of losses on the sale, exchange, or other disposition of a capital asset or property described in section 1231(b). Pursuant to its provisions, such losses are considered definitely related and allocable to the

class of gross income to which the property ordinarily gives rise in the hands of the taxpayer.

Respondent argues that petitioner's investment in Paty would ordinarily give rise to foreign source dividend income, and, therefore, petitioner's loss on the disposition of its Paty stock constitutes a foreign source loss. See Black & Decker Corp. v. Commissioner, T.C. Memo. 1991-557, affd. 986 F.2d 60 (4th Cir. 1993). Respondent argues that the fact that petitioner never actually received any dividends from Paty is irrelevant to the determination of the class of gross income to which the Paty stock loss is allocable, since this determination is based on an objective consideration of the facts and circumstances. See id.

Respondent's reliance upon sections 861 and 862 to justify application of section 1.861-8(e)(7), Income Tax Regs., is misplaced, as these sections are inapplicable in the instant case. The Tax Reform Act of 1986 amended these sections to eliminate their applicability to the sale of noninventory personal property. See Tax Reform Act of 1986, sec. 1211(b)(1)(B) and (C), 100 Stat. 2536. The impact of these changes becomes evident when current section 861(a) is read in the context of section 861(b), which provides: "From the items of gross income specified in subsection (a) as being income from sources within the United States there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto". Following its amendment in the Tax Reform

Act of 1986, section 861(a) no longer "specifies" gross income that is derived from the sale of noninventory personal property. Section 862(a) and (b) provides a substantially identical provision with respect to income received from sources outside the United States and related losses. Consequently, the pre-1987 versions of sections 861 and 862 are no longer applicable to determine the source of gain or loss from the sale of noninventory personal property.

Respondent's reliance upon our decision in Black & Decker Corp. v. Commissioner, supra, is similarly misplaced. In Black & Decker Corp., we determined that the taxpayer's worthless stock loss from its investment in a foreign subsidiary was to be allocated against foreign source dividend income and, therefore, constituted a foreign source loss for purposes of computing the taxpayer's foreign tax credit limitation. In affirming our decision, the Court of Appeals for the Fourth Circuit noted that the relevant transaction was governed by the Internal Revenue Code of 1954. See Black & Decker Corp. v. Commissioner, 986 F.2d at 62 n.1. The Court of Appeals stated: "we will discuss and cite to that act [the 1954 Act] although the Internal Revenue Code of 1986 now supersedes it." Id.

Section 865, which is applicable to the Paty transaction, provides that income realized from the sale of noninventory personal property generally will be sourced at the residence of the seller. Section 865(j)(1) provides that "The Secretary shall

prescribe such regulations as may be necessary or appropriate to carry out the purpose of this section, including regulations * * * relating to the treatment of losses".  Nevertheless, respondent contends that nothing in section 865 requires the Treasury to promulgate "any particular rule" with respect to the allocation of losses on the disposition of personal property.  We disagree.  Through the enactment of section 865(j)(1) directing the Secretary to promulgate regulations necessary to carry out the purpose of this section (i.e., residence-based sourcing), Congress intended to change the rules regarding the allocation of losses realized on the sale of noninventory personal property. Otherwise, section 865(j)(1) would be unnecessary and, indeed, meaningless.  The regulations that respondent would have us apply were already in place prior to the Tax Reform Act of 1986.  If Congress intended those existing regulations to apply, section 865(j)(1) is a nullity.

The purpose behind section 865(j)(1) is reflected in The General Explanation of the Tax Reform Act of 1986, prepared by the Joint Committee on Taxation, which provides as follows:

> The Act provides that regulations are to be prescribed by the Secretary carrying out the purposes of the Act's source rule provisions, including the application of the provisions to losses from sales of personal property * * *.  It is anticipated that regulations will provide that losses from sales of personal property generally will be allocated consistently with the source of income that gains would generate but that variations of this principle may be necessary.  * * *  [Staff of Joint Comm. on Taxation,

General Explanation of the Tax Reform Act of 1986, at 922-923 (J. Comm. Print 1987) (General Explanation).]

When Congress directs that regulations be promulgated to carry out a statutory purpose, the fact that regulations are not forthcoming cannot be a basis for thwarting the legislative objective.  It is well established that the absence of regulations is not an acceptable basis for refusing to apply the substantive provisions of a section of the Internal Revenue Code. See, e.g., Estate of Neumann v. Commissioner, 106 T.C. 216, 221 (1996); H Enters. Intl., Inc. v. Commissioner, 105 T.C. 71, 82 (1995); First Chicago Corp. v. Commissioner, 88 T.C. 663, 669 (1987), affd. 842 F.2d 180 (7th Cir. 1988); Occidental Petroleum Corp. v. Commissioner, 82 T.C. 819, 829 (1984).  In Estate of Neumann v. Commissioner, supra at 221, for instance, we determined that regulations were not a prerequisite to applying the generation-skipping tax to certain transfers when the relevant statutory language (sec. 7701(f)) provided:  "'The Secretary shall prescribe such regulations as may be necessary or appropriate to prevent the avoidance of those provisions of this title'".  We concluded that Congress had not given the Secretary the power to determine section 2663's application; i.e., whether the general rule of section 2663 applied to cases such as the taxpayer's.  Rather, we explained that Congress had simply authorized the Secretary to provide rules on how the section should apply.  Id.

In <u>Occidental Petroleum Corp. v. Commissioner</u>, <u>supra</u> at 829, we considered the effect on the alternative minimum tax of the absence of regulations under section 58(h).[6]  We stated:  "the failure to promulgate the required regulations can hardly render the new provisions of section 58(h) inoperative.  We must therefore do the best we can with these new provisions. Certainly we cannot ignore them."  <u>Id.</u>  We held that the absence of regulations did not preclude proper adjustments in respect of the tax benefit rule, and we proceeded to determine those adjustments in that case.  We reasoned that Congress had intended section 58(h) to provide a basis for how (as opposed to whether) the alternative minimum tax should be applied in order to take into account the tax benefit rule.  See <u>Estate of Neumann v. Commissioner</u>, <u>supra</u> at 220.

On brief, respondent argues that our decision in <u>Occidental Petroleum Corp. v. Commissioner</u>, <u>supra</u>, is distinguishable for several reasons.  First, respondent contends that section 58(h) explicitly provided that a particular rule (i.e., the tax benefit rule) was to be adopted in the regulations, whereas "section 865(j) merely provides that regulations are to be promulgated with respect to a particular subject matter but does not state or imply what rules are to be adopted with respect thereto."

---

[6]Sec. 58(h) provided that "The Secretary shall prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years."

Second, respondent maintains that the legislative intent underlying section 58(h) was well documented in the committee reports accompanying the enactment of that section, while no reference is made to section 865(j) in the relevant committee reports.  Finally, respondent asserts that contrary to the instant case there were no controlling preexisting regulations in Occidental Petroleum Corp.

Respondent's arguments are unpersuasive.  First, we conclude that Congress did intend that regulations promulgated pursuant to section 865(j) would embody a "particular rule"; i.e., residence-based sourcing would generally be used for losses realized on the sale of noninventory personal property.  Second, respondent's reliance on the absence of any mention of section 865(j) in the committee reports is erroneous, since Congress articulated the overall purpose behind section 865 in the legislative history.  See supra pp. 8-9.  In addition, the General Explanation confirms that it was expected that losses generally would be sourced similarly to gains.  Although the General Explanation does not technically rise to the level of legislative history, we have nonetheless stated that "We are not unmindful of the fact that both the Supreme Court, and this Court, have relied upon the General Explanation in analyzing tax statutes * * * and that the General Explanation is entitled to great respect".  Rivera v. Commissioner, 89 T.C. 343, 349 n.7 (1987).

In the instant case, we must do "the best we can" in applying section 865 and the policy underlying it to a situation involving a loss realized by a U.S. resident on the sale of noninventory personal property.  Certainly, we are not free to ignore section 865 simply because the Secretary has delayed promulgating the appropriate regulations.  Occidental Petroleum Corp. v. Commissioner, supra at 829.  In enacting section 865, Congress determined that "the residence of the seller generally is the location of much of the underlying activity that generates income derived from sales of personal property".  H. Rept. 99-426, supra at 360, 1986-3 C.B. (Vol. 2) at 360.  Section 865(j)(1) directs the Secretary to promulgate regulations to carry out the purpose of section 865; i.e., that gains and losses on the sale of noninventory personal property generally are sourced at the residence of the seller.

The Explanation of Provisions accompanying the proposed regulations states that "Section 1.865-2(a) provides the general rule that stock losses are allocated in the same manner as stock gains * * *.  Thus, stock loss generally is allocated to the residence of the seller."  61 Fed. Reg. 35697 (July 8, 1996) (emphasis added).  Moreover, the proposed regulations, if adopted in their current form, would source petitioner's Paty stock loss at the residence of the seller; i.e., in the United States.  See sec. 1.865-2(a)(1), (e)(2)(i), Proposed Income Tax Regs., 61 Fed. Reg. 35696, 35697-35700 (July 8, 1996).

Respondent has not provided, nor have we found, any reason that would preclude application of the general rule articulated in section 865(a) to the facts in this case. Applying this general rule of residence-based sourcing, we hold that the loss realized by petitioner on the sale of its Paty stock constitutes a U.S. source loss for purposes of computing petitioner's foreign tax credit limitation pursuant to section 904(a).[7]

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[7]We emphasize the narrow scope of our decision herein. Our opinion does not hold that sec. 865 requires that losses realized on the disposition of noninventory personal property must always be sourced at the residence of the seller. To the contrary, we recognize, and the General Explanation accompanying the enactment of sec. 865 confirms, that exceptions to the general rule of residence-based sourcing may be appropriate to prevent abuse. See Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 923 (J. Comm. Print 1987).